# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-11-00222-CV

**Chia-Ying Persephone Chen, Appellant**

**v.**

**Marc A. Hernandez, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. D-1-FM-08-005282, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Appellant Chia-Ying Persephone Chen appeals the trial court's final order in a suit affecting the parent-child relationship. In five issues, Chen challenges the portion of the trial court's order granting appellee Marc A. Hernandez the exclusive right to designate the primary residence of their child. For the reasons that follow, we affirm the trial court's order.

### FACTUAL AND PROCEDURAL BACKGROUND

Chen, a citizen of Taiwan, came to the United States in 2004 when she was admitted to the University of Dallas Masters of Business Administration (MBA) program under an F-1 student visa.[1] She completed her MBA degree in May 2006, obtained employment in Austin, Texas, where

---

[1] An F-1 student visa allows a nonimmigrant to enter the U.S. as a full-time student at an accredited academic institution or language training program. The student must be enrolled in a course of study that culminates in a degree, diploma, or certificate, and the institution must be authorized by the U.S. government to accept international students. *See* U.S. Citizenship and

she moved in January 2007, and converted her visa to nonimmigrant H-1B status.[2]  Chen and

Hernandez met later in 2007 and had a brief relationship, during which Chen became pregnant with

K.R.H.C.  Chen and Hernandez never married and, although the record is unclear, it appears that

they resided together only briefly, if at all.  After K.R.H.C. was born in June 2008, the parents

followed an informal arrangement regarding possession and payment of expenses.  In October 2008,

Chen filed suit requesting that the court appoint the parents joint managing conservators and name

Chen as the conservator with the exclusive right to designate K.R.H.C.'s primary residence.

Hernandez filed an answer, motion for temporary orders, and counterpetition, alleging that there was

a risk of international abduction and seeking passport and travel controls as well as to be named the

joint managing conservator with the exclusive right to designate K.R.H.C.'s primary residence.  In

March 2009, Hernandez married Angela Millman, whom he had begun dating in December 2007.[3]

       In April 2009, Chen was laid off from her job.  In September 2009, the trial court

appointed a guardian ad litem to determine the best interests of K.R.H.C. and make a

---

Immigration Services, http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6
a7543f6d1a/?vgnextoid=e34c83453d4a3210VgnVCM100000b92ca60aRCRD&vgnextchannel=e
34c83453d4a3210VgnVCM100000b92ca60aRCRD (last visited July 30, 2012).

       [2] U.S. businesses use the H-1B program to employ foreign workers in speciality occupations,
such as science, engineering, or computer programming.  An H-1B nonimmigrant may be admitted
for a period of up to three years, which may be extended but generally cannot go beyond a total of
six years. *See id.*, http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543
f6d1a/?vgnextoid=73566811264a3210VgnVCM100000b92ca60aRCRD&vgnextchannel=73566
811264a3210VgnVCM100000b92ca60aRCRD (last visited July 30, 2012).

       [3] Millman has two children from a prior marriage and shares custody with her ex-husband
on a "50/50" basis.  In addition, at the time of trial, she and Hernandez were expecting a child in
December 2010.  Thus, K.R.H.C. has no siblings but does have one younger half-sibling and two
older step-siblings.

recommendation to the court regarding conservatorship, possession, and access. *See* Tex. Fam. Code Ann. § 107.021(a)(3) (West 2008) (trial court has discretion to appoint guardian ad litem in suits other than by governmental entity in which best interests of child at issue). The guardian ad litem, Leslie Smith,[4] worked with the parties to establish a visitation schedule and accommodate each other's needs for flexibility. At some point, the parties agreed to a schedule that provided for K.R.H.C. to stay with Hernandez on Tuesday nights, Thursday evenings, and every first, third, and fifth weekend.

Chen remained unemployed for more than a year and was required to change her visa status to B-2.[5] In April 2010, she began interviewing with PRG Group, a company that hires workers and places them in contract positions. In early May 2010, PRG hired Chen, agreed to sponsor her for an H-1B visa, and began attempting to locate a contract position for her. On June 9, 2010, Chen notified Hernandez and Smith that PRG had located a position for her in Richardson, Texas, more than 200 miles from Austin, and requested modifications to the visitation schedule to accommodate her relocation. In mid-June, Chen began working in Richardson, where she and K.R.H.C. resided temporarily with friends. Chen retained her apartment in Austin and for the next two months returned to Austin at times on the weekends although the parties dispute the frequency.

---

[4] At the hearing on temporary orders, Smith testified that she is a licensed professional counselor and a licensed marriage family therapist and is credentialed and qualified to be a parent coordinator and facilitator.

[5] A B-2 visa is a visitor visa obtained if the purpose for travel to the U.S. is pleasure, tourism, or medical treatment, as opposed to a B-1 visa, which applies to travel to the U.S. for such purposes as consultation with business associates, professional conferences, or contract negotiations. *See* U.S. Department of State website, http://travel.state.gov/visa/temp/types/types_1262.html#1 (last visited July 30, 2012).

Smith filed her report in June 2010, and on July 30, 2010, the trial court held a hearing on the parties' competing motions for temporary orders.[6] After hearing evidence, including testimony regarding Chen's relocation to Richardson, the trial court appointed the parties temporary joint managing conservators and designated Chen as the temporary joint managing conservator with the exclusive right to designate the primary residence of K.R.H.C. The trial court further ordered that after August 22, 2010, the primary residence of K.R.H.C. was to be in Travis and contiguous counties until further order. On August 17, 2010, the trial court signed temporary orders memorializing its rulings and also setting the case for trial on September 27, 2010.

Four days after the hearing, on August 3, 2010, Chen signed a twelve-month lease for an apartment in Richardson, and she and K.R.H.C. moved in two days later. Chen then obtained permission to work remotely through September 29, 2010, and on or before August 22, 2010, she and K.R.H.C. began staying with friends in Cedar Park, Texas, in Williamson County, which is contiguous to Travis County. Trial was delayed several times, Chen's permission to work remotely expired, and she began working during the week in Richardson and returning to Cedar Park on weekends. Chen's mother, a Taiwanese resident temporarily visiting the U.S., cared for K.R.H.C. at the home of Chen's friends while Chen worked in Richardson.

---

[6] The trial court originally signed temporary orders in May 2009 after a hearing that Hernandez did not attend. Hernandez sought a de novo hearing on the ground that he did not attend the hearing because counsel for Chen had agreed to cancel it. The parties then entered into a Rule 11 agreement setting aside the temporary orders and operated without temporary orders until the July 2010 hearing.

4

**Trial**

In a two-day trial, the court heard the testimony of eight witnesses, including Hernandez, Chen, Smith, an immigration attorney, and friends and relatives of the parties. The primary factual disputes concerned the parties' ability to provide stability for K.R.H.C. and support of the other parent and whether Chen had unduly restricted Hernandez's access to K.R.H.C. Also of primary concern was Chen's visa status and intentions regarding returning to Taiwan. The trial court also considered more than forty exhibits, including numerous email exchanges among Chen, Hernandez, and Smith.

**Hernandez's Testimony**

Hernandez testified generally concerning his relationship with Chen. He stated that he and Chen met through a mutual friend and had a "rocky turbulent relationship" that lasted three months and that shortly after he ended the relationship, Chen informed him that she was pregnant. He also stated that they initially decided to terminate the pregnancy, but Chen then asked him for a "fake marriage" so that she could stay in the country. Hernandez further testified that they considered "getting married for the sake of the child and to get her a green card with the plan of getting divorced in two years, when she received her green card," but that when he learned their planned course of action was illegal, he decided not to enter into such an arrangement. He further stated that initially Chen wanted him to be very involved with caring for K.R.H.C., but that after

5

their marriage plans were called off, she "was very upset" and "wanted [him] to go away." Hernandez also testified that he was present at the hospital when K.R.H.C. was born and when there were health complications, he remained there during the week the child was in the intensive care unit.

Regarding their communication and informal visitation arrangements after K.R.H.C. was born, Hernandez testified that initially the parents were relatively communicative, but that after two or three weeks, Chen became unwilling to negotiate, they began to have disagreements about Hernandez's visitation, and Chen wanted him to be responsible for all the transportation of the child. Hernandez testified that Chen usually refused his requests for additional time or schedule changes and at one point indicated by email that she was "evaluating the pros and cons" of letting a friend babysit K.R.H.C. "rather than his father." He also stated that Chen told him he could relinquish his role as a dad, she did not want K.R.H.C. to have two homes, K.R.H.C.'s time with Hernandez should be a "vacation," and she could "make [his seeing his child] not happen" by taking him back to Taiwan. He further stated that Chen mentioned taking K.R.H.C. back to Taiwan "on one other occasion" and that she made both comments soon after K.R.H.C. was born.

As to Chen's relocation, Hernandez testified that he first learned of Chen's job outside Austin in a email from her on June 10, 2010. He stated that after Chen moved to Richardson, she proposed a "50/50" visitation schedule whereby he would continue to handle all of the transportation of the child, would have possession every first, third, and fifth weekend, and "some times during the week . . . could drive to Richardson, see [K.R.H.C.] at daycare for four hours, and then return him to her and go back . . . to Austin the same day." Hernandez also testified that he was

6

requesting a 50/50 possession schedule and to be named the joint managing conservator with the exclusive right to designate K.R.H.C.'s primary residence because his understanding is that under Taiwanese law, Chen can take the child to Taiwan without his consent. He stated his hope that his being named primary conservator would "help facilitate [Chen's] ability to work with us."

**Chen's Testimony**

Concerning her relationship with Hernandez and their communication about visitation, Chen testified that she considered terminating the pregnancy when Hernandez said he was not ready to be a father, but within a week he changed his mind. She stated that they "considered getting married so that [she] can have a green card, but [she] did not propose [the idea]" and that they began planning their wedding but Hernandez decided not to get married. In response to Hernandez's testimony that she had been unwilling to work with him on flexible visitation, Chen testified about an occasion on which Hernandez asked for extra time and she canceled her dinner plans with K.R.H.C. so that Hernandez could have visitation. She also referred to an email exchange with Hernandez regarding K.R.H.C.'s medical issues as an example that they were able to communicate in a friendly way about that topic. She stated that she had tried to accommodate Hernandez's schedule but his last-minute requests made it difficult.

Regarding her email comments to Hernandez that she was "evaluating the pros and cons" of letting K.R.H.C. stay with friends rather than Hernandez, Chen stated that she never felt that way but Hernandez was unable to take care of the child when she needed him to help her and that she believes it depends on the circumstances whether it is better for someone other that K.R.H.C.'s father to take care of him. She also stated that she has concerns that when K.R.H.C. is with

7

Hernandez he does not stay on his routine because he returns "very needy, very tired." Concerning her family and friends, Chen testified that she has an aunt and uncle in Plano, Texas, and two aunts in Boston. She stated that her parents and only sibling live in Taiwan, and her mother visits yearly on a visitor's visa. Chen also stated that she has forty to fifty friends in Central Texas who are "very caring and very supportive" and "a lot of friends in [the] Dallas area."

Chen also testified about her employment, relocation, and visa status. She stated that PRG agreed to find her employment in Central Texas but was unable to locate an "affordable contract" in the area that would meet the H-1B visas requirements. She testified that she notified Hernandez and Smith on the same day that she got the job offer in Richardson and did not tell them sooner because she was under the impression that she would get a job in Central Texas and did not want to create a problem before one existed. She added that she is still searching for employment in Central Texas but is "not applying." Hernandez further testified that she signed a year-long lease in Richardson after the trial court ordered her to establish K.R.H.C.'s residence in Travis or contiguous counties by August 22, 1010, because she believed she could break the lease if the trial court ordered her to return to Central Texas and that after she moved she brought K.R.H.C. home every weekend to make up for the lack of weekday visitation. Chen stated her opinion that after she moved to Cedar Park, it was preferable for her mother to take care of K.R.H.C. rather than Hernandez because she wants K.R.H.C. to "spend as much time with his grandmother as possible."

Regarding future visitation, Chen testified that if she is awarded custody, she will "try [her] best" to involve Hernandez in K.R.H.C.'s life; she will assist in transportation, encourage Hernandez to participate in school events and phone and video conferences, and "pay or help him

8

find a hotel or a place to live for [K.R.H.C.] to be able to spend overnight visit[s] with his dad." She stated that she does not believe K.R.H.C. is ready for 50/50 visitation but when he is older it "would be a good idea" if it did not "interfere with [his] routines and [his] school schedules." As for her intentions about returning to Taiwan, Chen testified that when she came to the U.S., she did not plan to stay but changed her mind so that K.R.H.C. could have his father in his life. She added that her father had been absent from her life and she did not want that for her child. When asked by the trial court why the court should not be concerned that she would go back to Taiwan, Chen responded, "because that's not the decision I would make for my son. If I want to, I could have gone by now, but it's never an option for me."

**Guardian Ad Litem's Testimony**

Smith testified as to her observations concerning the parents' interaction and communication, as well as their respective relationships with K.R.H.C. She testified that she initially had a great deal of contact with the parties and "[i]t became clear to [her] that [she] was working with two very well-educated, intelligent, articulate, very good parents, and that there were no issues of drug use or . . . dangerous behavior." She stated that the primary issues were custody and visitation and she considers this a "high conflict" case. Smith also testified as to her concern regarding Chen's visa status and stated that every time she questioned Chen about it, Chen told her "not to worry, she could go back to school" if she could not find a job. She stated that Chen's actions were not always consistent with her statements that she wanted Hernandez to spend more time with K.R.H.C.

9

Smith also testified concerning her recommendations. Smith stated that the parties were "equal in terms of parenting and education" and in making her recommendation, she had "to take into consideration which parent is going to be more supportive of the other parent . . . and who is going to provide the best emotional stability for the child and support of the other parent." She stated that her initial goal was 50/50 possession, which Chen opposed, but she believed was in the best interest of K.R.H.C., who is very bonded to both parents. She stated that from January to June 2010, "it was pretty stable"and "was moving toward a 50/50 arrangement." However, she stated, after Chen's move to Richardson, despite the standing orders prohibiting such a move, that arrangement is too difficult and she now believes the child should remain in Travis County with his father. Smith testified that at this point, her recommendation was that Hernandez be the primary conservator and that only if Chen lives in Austin should there be a 50/50 possession schedule.

Smith further testified that, although Chen said that she intended to stay in the U.S., she was concerned about her taking K.R.H.C. to Taiwan, does not think that issue should be disregarded, and was asking the court to put in place appropriate statutory measures to alleviate that concern. She stated that she "was told several things during the months that [she worked with Chen] that have since not come to fruition" and she believes it is "fully in [K.R.H.C.]'s best interest not to go to Taiwan" at this point. Smith also stated that in her observation, Chen has not always complied with court orders and agreements between the parties.

**Immigration Attorney's Testimony**

Immigration attorney Myron Morales testified generally concerning Chen's visa applications and status and the rules and procedures for various types of visas. Regarding the

guidelines for an F-1 student visa, he testified that schools participating in the F-1 visa program generally have enrollment periods, with no guarantee of acceptance, as well as income requirements that Chen does not meet. He also testified that students cannot work or seek lawful residence while under an F-1 visa. Based upon his review of documents related to Chen's visa status and applications, Morales stated his opinion that applying for an F-1 visa would not have been a viable option for Chen and if she had not accepted the job in Richardson, Chen's visa would have expired and she would have had to leave the country. He further stated that Chen is not eligible for family-based immigration because she does not have a qualifying relative who is a U.S. citizen and having a child does not affect the parent's status. Morales also testified that her current employer had begun the labor certification process so that Chen should have her green card within six to eight months. He stated that if the court orders Chen to return to Austin, he would advise her to remain in her current job until she could find a new employer sponsor.

**Passport Guidelines**

Following the testimony of the witnesses, the trial court questioned the attorneys, reviewed exhibits, and reviewed government websites regarding the U.S. and Taiwanese requirements for obtaining passports for minors. The court then stated that before ruling it needed to review the government websites further to ensure a complete understanding of the "requirements of the government as it relates to the passport of the child—not that that's the only issue or concern here, and the—but it is an issue, and the Court needs to make sure that I have all of the information necessary for the court to make its ruling."

11

**The Trial Court's Ruling**

In its final order, the trial court named the parents joint managing conservators and awarded Hernandez the exclusive right to designate K.R.H.C.'s primary residence in Travis and contiguous counties. With regard to possession and access, the trial court ordered a transition period of gradually increasing possession by Hernandez until March 1, 2011. Thereafter, when Chen lives within 100 miles of Hernandez, there is to be expanded standard visitation as set out in the family code, *see id.* §153.312 (West Supp. 2011), until June 2012, as K.R.H.C. approaches the age of four, at which time a 50/50 week-on/week-off possession schedule is to be implemented. When Chen resides more than 100 miles from Hernandez, a modified expanded standard visitation schedule without midweek visits is to be followed until June 2012, at which time standard possession for parents residing more than 100 miles apart is to be implemented. *See id.* § 153.313 (West Supp. 2011).

The trial court found that credible evidence had been presented that there was a potential risk of the international abduction of K.R.H.C. by Chen. The trial court further found that:

a.  Chia-Ying Chen has taken, enticed away, kept, withheld, or concealed the child in violation of Marc A. Hernandez's right of possession of or access to the child;

b.  Chia-Ying Chen has previously threatened to take, entice away, keep, withhold, or conceal the child in violation of Marc A. Hernandez's right of possession or access to the child;

c.  Chia-Ying Chen has strong familial, emotional, or cultural ties to another country, Taiwan, which is not a signatory to or compliant with the Hague Convention on the Civil Aspects of International Child Abduction;

d.  Chia-Ying Chen lacks strong ties to the United States.

*See id.* § 153.501 (West 2008) (if credible evidence presented, court shall determine if abduction prevention measures appropriate), .502 (West Supp. 2011) (abduction risk factors court shall consider to determine risk of international abduction of child by parent). To protect K.R.H.C. from the risk of abduction, the trial court ordered certain abduction prevention measures. *See id.* § 153.503 (West 2008) (allowable abduction prevention measures). At Chen's request, the trial court made findings of fact and conclusions of law. This appeal followed.

## STANDARD OF REVIEW

We review a trial court's decisions regarding conservatorship and determination of which conservator will have the exclusive right to establish the child's primary residence under an abuse of discretion standard. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *In re K.L.W.*, 301 S.W.3d 423, 428 (Tex. App.—Dallas 2009, no pet.). "A trial court abuses its discretion when its ruling is arbitrary, unreasonable or without reference to any guiding rules or legal principles." *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000). "The trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record," and a trial court does not abuse its discretion as long as there is some substantive, probative evidence to support its decision. *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.) (citing *Jeffers v. Wallace*, 615 S.W.2d 252, 253 (Tex. Civ. App.—Dallas 1981, no writ)) (quoting *Thompson v. Haney*, 191 S.W.2d 491, 493 (Tex. Civ. App.—Amarillo 1945, no writ)).

13

Under an abuse of discretion standard, legal and factual sufficiency challenges to the evidence are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied); *In re D.M.*, 191 S.W.3d 381, 393 Tex. App.—Austin 2006, pet. denied). Because we apply an abuse of discretion standard to these issues, the traditional sufficiency standards of review overlap the abuse of discretion standard, and appellate courts apply a hybrid analysis. *Zeifman*, 212 S.W.3d at 587–88; *Echols v. Olivarez*, 85 S.W.3d at 476. Once it has been determined that the abuse of discretion standard applies, an appellate court engages in a two-pronged inquiry: (1) whether the trial court had sufficient information on which to exercise its discretion, and (2) whether the trial court erred in its application of discretion. *Zeifman*, 212 S.W.3d at 588. The traditional sufficiency review comes into play with regard to the first question; however, the inquiry does not end there. *Id.*; *Echols*, 85 S.W.3d at 478. The appellate court then proceeds to determine whether, based on the evidence, the trial court made a reasonable decision, that is, that the court's decision was neither arbitrary nor unreasonable. *Zeifman*, 212 S.W.3d at 588; *Echols*, 85 S.W.3d at 478.

When the appellate record includes the reporter's record, as in this case, the trial court's findings, express or implied, are not conclusive and may be challenged on appeal for evidentiary sufficiency. *Sixth RMA Partners v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003). We review a trial court's findings of fact for legal and factual sufficiency of the evidence by the same standard applied to a jury verdict. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam). In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the judgment, crediting favorable evidence if a reasonable fact finder could, and

14

disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). The test is "whether the evidence at trial would enable reasonable and fair-minded people to reach the [judgment] under review." *Id.* at 827. In reviewing factual sufficiency of the evidence, we consider and weigh all of the evidence in the record, and we may overturn a judgment only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Ortiz*, 917 S.W.2d at 772; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). However, this Court is not a fact finder, and we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

We review a trial court's conclusions of law *de novo* and will uphold the conclusions if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Kendall Builders, Inc. v. Chesson*, 149 S.W.3d 796, 803 (Tex. App.—Austin 2004, pet. denied). Although a trial court's conclusions of law may not be challenged for factual sufficiency, we may review the legal conclusions drawn from the facts to determine whether the conclusions are correct. *BMC Software*, 83 S.W.3d at 794. In all suits regarding conservatorship and possession of and access to children, the best interest of the children "shall always be the primary consideration of the court." Tex. Fam. Code Ann. § 153.002 (West 2008); *Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex. 2002). The trial court is given wide latitude in determining the best interest of a minor child. *Gillespie*, 644 S.W.2d at 451.

15

**DISCUSSION**

In the first four of her five issues, Chen contends that the trial court abused its discretion in awarding Hernandez the exclusive right to designate K.R.H.C.'s primary residence.[7]

**Employment in Richardson**

In issue one, Chen argues that the trial court abused its discretion by basing its ruling on Chen's decision to accept employment in Richardson. She cites a parent's statutory duty to support her child financially, *see* Tex. Fam. Code Ann. § 151.001(a)(3) (West 2008) (duty to support child, including providing clothing, food, shelter, medical and dental care, and education), and relies on cases in which the courts allowed a custodial parent to relocate when it was found to be in the best interest of the child, *see, e.g.*, *In re Cooper*, 333 S.W.3d 656, 661 (Tex. App.—Dallas 2009, no pet.) (orig. proceeding) (vacating temporary order prohibiting custodial parent's relocation pending trial when evidence showed move would significantly improve custodial parent's economic circumstances to child's benefit); *Echols*, 85 S.W.3d at 483 (upholding modification of joint managing conservatorship lifting residency restriction on custodial parent based on finding under standard in prior family code section 156.202 that modification was positive improvement for and in best interest of child).[8] In essence, Chen argues that her relocation was necessitated by

---

[7] Although Chen couches her issues in terms of the trial court's "altering conservatorship," because this is an appeal from an original determination of conservatorship, we construe Chen's issues as stated.

[8] *See* Act of May 23, 1987, 70th Leg., R.S., ch. 744, § 7, 1987 Tex. Gen. Laws 2666, 2670, *repealed by* Act of May 22, 2001, 77th Leg., R.S., ch. 1289, § 12(2), 2001 Tex. Gen. Laws 3108, 3111 (requiring showing that modification would be positive improvement). Section 156.202 was replaced by section 156.101 of the family code, which does not require a showing that the modification would be a positive improvement for the child. *See* Tex. Fam. Code Ann. § 156.101

circumstance and in line with her duty to support K.R.H.C. *See* Tex. Fam. Code Ann. § 151.001(a)(3).

We observe initially that the cases Chen cites involve modifications of residency restrictions placed on the parent awarded primary custody in temporary orders or previously-determined conservatorships, *see, e.g.*, *In re Cooper*, 333 S.W.3d at 658; *Echols*, 85 S.W.3d at 476, not original determinations of conservatorship, as in this case. Here, the question before the trial court was not whether Chen, as custodial parent, should be allowed to relocate, but who should be the custodial parent. Thus, we find these cases inapposite.

Further, the nature of Chen's challenge is less than clear. She cites five of the trial court's findings of fact as "relevant to this issue" but does not appear to argue that the evidence is factually or legally insufficient to support any of the findings.[9] Rather, the thrust of Chen's argument is that the trial court appointed Hernandez as the custodial conservator *because* Chen accepted employment in Richardson and to do so on that basis was an abuse of discretion. However, while the findings of fact Chen cites as "relevant to this issue" do relate to her acceptance of employment

_____

(West Supp. 2011); *Echols v. Olivarez*, 85 S.W.3d 475, 478 n.2 (Tex. App.—Austin 2002, no pet.).

[9] In the Statement of Facts section of her brief, Chen comments on two of the five cited findings. She notes that finding of fact 13 states that Chen was "let go" from her job when, according to Chen, she was "laid off" and asserts that finding of fact 16 "incorrectly" states that Chen received an offer of employment from a company in Plano, Texas, on April 15, 2010, when Chen actually received the offer from a company in Richardson on June 9, 2010. In the Summary of the Argument section of her brief Chen also refers to finding of fact 18—which states that Chen notified Hernandez of her intention to leave Travis County on June 9, 2010—not to attack its accuracy, but to contest the implication, when findings 16 and 18 are read together, that Chen waited two months to inform Hernandez of her employment in Richardson. However, in her argument of issue one, Chen does not assert that the evidence to support these findings is legally or factually insufficient.

17

in Richardson, there is nothing in the record to suggest that the trial court based its ruling on Chen's employment decision. The record shows that the trial court named Hernandez as the conservator with the right to designate K.R.H.C.'s primary residence based primarily on the recommendations of Smith and on the concern that Chen may return to Taiwan with K.R.H.C., not primarily on the fact that Chen accepted employment in Richardson.[10]

To the extent Chen intends issue one to be a factual sufficiency challenge to the evidence supporting the cited findings, we find her argument unpersuasive. The undisputed evidence showed that Chen accepted a job in Richardson and relocated there with K.R.H.C. with, at best, minimal notice to Hernandez and Smith. There was conflicting testimony regarding when Chen made it clear to Hernandez that she intended to move to Richardson, and Smith testified that Chen did not request her permission to relocate until June 20, 2010, almost two weeks after her move. We defer to the trial court's first-hand assessments of the credibility of the witnesses and conclude that the trial court assessments could have informed its view of the testimony. *See City of Keller*, 168 S.W.3d at 819; *Echols*, 85 S.W.3d at 477. Thus, to the extent there are any minor mischaracterizations of fact in the findings, such as whether Chen was "laid off" or "let go" or how

---

[10] Smith testified that although she believed that a 50/50 possession schedule would be the best solution, it was not possible with Chen living in Richardson, that Hernandez could provide the most emotional stability, that of the two parents Hernandez had been the more flexible and supportive, and that she recommended K.R.H.C. remain in Travis County with Hernandez. Both Smith and the trial court expressed concerns that Chen would return to Taiwan with K.R.H.C., and the trial court reviewed the applicable passports guidelines and questioned the attorneys regarding Chen's ability to do so. Read as a whole, the record shows that it was this evidence, as well as additional evidence addressed in our discussion of subsequent issues, that formed the basis of the trial court's decision to award Hernandez the exclusive right to designate K.R.H.C.'s primary residence.

many days notice of her move Chen gave, they do not render the findings so against the great weight of the evidence as to be clearly wrong and manifestly unjust, and there was factually sufficient evidence to support the findings. *See Cain*, 709 S.W.2d at 176. Accordingly, we conclude that the trial court had sufficient information on which to exercise its discretion and that, even to the extent it considered the evidence that Chen accepted employment in Richardson, its decision was neither arbitrary nor unreasonable in light of the entire record. *See Zeifman*, 212 S.W.3d at 588; *Echols*, 85 S.W.3d at 478. We overrule issue one.

**Sufficiency of Evidence**

In issues two through four, Chen alleges that the trial court abused its discretion in basing its decision to name Hernandez the custodial conservator on its findings of fact related to (1) whether Chen violated the temporary orders, (2) the potential risk of international abduction, and (3) Chen's level of cooperation with Hernandez. We address each issue in turn.

*Violation of Temporary Orders*

In her second issue, Chen contends that the trial court abused its discretion in awarding Hernandez primary custody because the evidence that Chen violated the trial court's temporary orders was legally insufficient to support the relevant findings. Chen challenges the following findings of fact:

21. The Honorable Judge Sheppard ruled that Chia-Yeng [sic] "Persephone" Chen could remain in North Texas for her employment but that the child would remain in Travis County during the pendency of the suit.

. . .

19

24.    The credible evidence at the trial showed that Chia-Ying "Persephone" Chen, in direct contravention of Judge Sheppard's Order, moved the child in with friends into their home in Williamson County and she was able to arrange her work to telecommute from Austin for a period of time while the case continued.

Chen argues that there is no evidence to support findings of fact 21 and 24. She further contends that finding of fact 24 is erroneous because the temporary orders were "not a command to return to Travis County only" but an order to return to Travis or contiguous counties and that by moving in with friends in Williamson County, which is contiguous to Travis County, Chen did not violate the order.

We agree that finding of fact 21 misstates the language of the temporary orders. The temporary orders did not expressly address Chen's location or require K.R.H.C. to remain in Travis County during the entire pendency of the suit; instead, the orders required that after August 22, 2010, K.R.H.C.'s primary residence must be in Travis or contiguous counties, giving Chen the right to designate K.R.H.C.'s primary residence within Travis or contiguous counties, and leaving open the residence of K.R.H.C. prior to August 22, 2010. However, although findings of fact form the basis of the trial court's judgment, *see* Tex. R. Civ. P. 299, finding 21, as a recitation of a prior trial court order, is a finding on an evidentiary matter, not on an ultimate, controlling, and material issue. *See Flanary v. Mills*, 150 S.W.3d 785, 792–93 (Tex. App.—Austin 2004, pet. denied) (distinguishing between findings on controlling matters, which are essential to cause of action and have direct effect on judgment, and evidentiary matters, which trial court may consider in deciding controlling issues, but are not themselves controlling); *MacGillivray v. MacGillivray*, No 04-10-00109-CV, 2011 Tex. App. LEXIS 4160, at *23–24 (Tex. App.—San Antonio 2011, pet. denied) (mem. op.) (same).

20

Finding 21 thus serves an evidentiary predicate to finding 24, in which the trial court found that Chen violated the temporary orders.

We turn, then, to finding of fact 24. Chen's complaint with finding 24 is that it refers only to Travis County while the temporary orders required that the child be returned to Travis "*and contiguous counties*." (Emphasis added). While Chen's characterization of the temporary orders' statement regarding counties is accurate, the record shows that on multiple occasions both parties, whether by mistake or as a shorthand reference, referred to Travis County only. In fact, as Chen concedes, trial counsel for Chen "misstated" at least twice that the order was to return the child to "Travis County." In any event, regardless of the fact that this misstatement was repeated in finding of fact 24 and regardless of any misstatements in finding 21, the critical fact is that the temporary orders actually required that "after August 22, 2010, the *primary residence* of the child shall be in Travis or contiguous counties until further order of the Court." (Emphasis added). Because Chen and K.R.H.C. only resided temporarily in Cedar Park as guests in the home of Chen's friends, the evidence shows that Chen did, in fact, violate the order that she *establish the child's residence* in Travis or contiguous counties after August 22, 2010. Viewing the evidence in the light most favorable to the final order, we conclude that the evidence was sufficient to allow reasonable and fair-minded people to reach the decision reached by the trial court and was therefore legally sufficient to support findings 21 and 24. *See City of Keller*, 168 S.W.3d at 807, 827. Based on the facts of this case, we therefore further conclude that the trial court had sufficient evidence on which to exercise its discretion and did so appropriately. *See Zeifman*, 212 S.W.3d at 588; *Echols*, 85 S.W.3d at 478. We overrule issue two.

21

*Potential Risk of International Abduction*

In her third issue, Chen contends the trial court abused its discretion in naming Hernandez the conservator with the exclusive right to designate K.R.H.C.'s primary residence because there is legally and factually insufficient credible evidence to support the trial court's findings related to the potential risk of international abduction. The family code provides trial courts a statutory basis for determining the risk of international abduction in certain cases and ordering preventive measures based on that risk. *See* Tex. Fam. Code Ann. §§ 153.501–.503. If there is credible evidence of a potential risk of international abduction, the trial court must determine whether to take one or more of the preventive measures described in section 153.503. *See id.* §§ 153.501(a), .503(1)–(8). In determining whether to take any measures, the court shall consider (1) public policies described in section 153.001(a)[11] and the best interest of the child under section 153.002;[12] (2) the risk of international abduction based on the court's evaluation of risk factors set out in section 153.502; (3) any obstacles to locating, recovering and returning the child if international abduction occurs; and (4) the potential physical or psychological harm to the child if international abduction occurs. *Id.* §153.501(b)(1)–(4).

---

[11] Section 153.001 states that it is the public policy of the state to assure that children have frequent contact with parents who act in the best interest of the child; to provide a safe, stable, and nonviolent environment for the child; and to encourage parents to share in the rights and duties of raising their child after separation or divorce. *See* Tex. Fam. Code Ann. § 153.001(a)(1)–(3) (West 2008).

[12] Section 153.002 provides that the best interest of the child shall always be the primary consideration in determining issues of conservatorship, possession, and access. *See id.* § 153.002 (West 2008).

In determining the risk of international abduction under section 153.502, the trial court is to engage in a two-step process: (1) determine if there is credible evidence of a risk of abduction; (2) if so, evaluate the risk. *Id.* § 153.502. Subsection (a) provides a list of evidentiary factors the court shall consider in determining whether there is a potential risk of abduction—whether the parent (1) has taken, enticed away, kept, withheld, or concealed the child; (2) has threatened to do so; (3) lacks financial reason to stay in the U.S.; (4) has recently engaged in planning activities that could facilitate the removal of the child from the U.S.; (5) has a history of domestic violence; or (6) has a criminal history or a history of violating court orders. *Id.* § 153.502(a)(1)–(6). An affirmative finding of one of the factors is sufficient evidence for the court to proceed to the second step of considering the additional statutory factors listed in subsection (b). *See In re Sigmar*, 270 S.W.3d 289, 299–300 (Tex. App.—Waco 2008, orig. proceeding) (observing that statute does not specify the number of factors on which court must make affirmative findings and lists factors in the disjunctive) (citing Unif. Child Abuse Prevention Act § 7 cmt., 9 Part IA U.L.A. at 42) (suggesting no particular number of risk factors listed in statute, which are essentially same as in section 153.502, is required).

Subsection (b) of section 153.502 proscribes two mandatory factors for the court to consider in evaluating the risk found to exist under subsection (a): whether the parent (1) has strong familial, emotional, or cultural ties to another country, particularly one that is not a signatory to or compliant with the Hague Convention on the Civil Aspects of International Child Abduction; or (2) lacks strong ties to the U.S., regardless of whether the parent is a citizen or permanent resident of the U.S. Tex. Fam. Code Ann. § 153.502(b)(1),(2). Subsection (c) sets out additional,

23

discretionary factors the court may consider in evaluating the risk. *See id.* § 153.502 (c)(1)–(4).

Section 153.503 authorizes certain measures that the court may take if it finds preventive measures

necessary under section 153.501. *Id.* §§ 153.501, .503.

We turn first to the factors under section 153.502(a). Of the numerous findings of

fact that Chen contends "labeled [her] a kidnapper," only findings 10 and 29 relate to the risk factors

the court is to consider under subsection (a). In these findings, the trial court found that:

> 10. Chia-Ying "Persephone" Chen stated via email and otherwise after the birth of [K.R.H.C.] that her family lived in Taiwan and that she would like to return at some point, even threatening to take [K.R.H.C.] away from his father.
>
> . . .
>
> 29. The credible evidence presented at trial showed that Chia-Yeng [sic] "Persephone" Chen has taken, enticed away, kept, withheld, or concealed K.R.H.C. in violation of the visitation rights of Marc Hernandez; Chia-Yeng [sic] "Persephone" Chen did not present credible evidence that she believed in good faith that her conduct was necessary to avoid imminent harm to K.R.H.C. or to herself.

*See id.* § 153.502 (a)(1), (2). With regard to finding 10, the undisputed evidence showed that Chen

had on two occasions threatened to return to Taiwan with K.R.H.C. In cross examination of

Hernandez, Hernandez stated that it was possible that Chen made the statements because of the

emotion of recently giving birth, but Chen did not offer testimony on this issue. Chen argues on

appeal that "[m]ore evidence than one parent's accusation should be required." However, this

argument ignores the fact that in her testimony Chen did not dispute the allegation, and her appellate

argument is not supported by any authority. *See* Tex. R. App. P. 38.1(i). Viewed in the light most

24

favorable to the trial court's decision, this uncontroverted evidence could be considered "credible evidence" of a "risk of abduction" under subsection (a). *See* Tex. Fam. Code Ann. § 153.501(a); *In re Sigmar*, 270 S.W.3d at 300.[13]

Having found credible evidence of at least one factor in section 153.502(a), the trial court was then required to consider the mandatory factors under subsection (b): whether Chen "has strong familial, emotional, or cultural ties to another country" that is not a signatory to the Hague Convention of the Civil Aspects of International Child Abduction and whether she lacks strong ties to the U.S. *See* Tex. Fam. Code Ann. § 153.502(b)(1)–(2); *In re Sigmar*, 270 S.W.3d at 300–01; *Boyo v. Boyo*, 196 S.W.3d 409, 423–24 (Tex. App.—Beaumont 2006, no pet.); *Karenev v. Karenev*, No. 02-06-00269-CV, 2008 Tex. App. LEXIS 2087, at *5–6 (Tex. App.—Ft. Worth 2008, no pet.) (mem. op.). Chen challenges the following findings related to subsection (b):

30. The credible evidence presented at trial showed that Chia-Yeng [sic] "Persephone" Chen has strong ties with Taiwan, a country that is not a signatory to or compliant with the Hague Convention on the Civil Aspects of International Child Abduction.

---

[13] Because an affirmative finding on only one of the preliminary factors in subsection (a), if supported by the evidence, is all that is required for the court to proceed to a consideration of the additional factors listed in subsections (b) and (c), *see In re Sigmar*, 270 S.W.3d 289, 299–300 (Tex. App.—Waco 2008, orig. proceeding), we confine our analysis to finding 10 and do not reach Chen's challenge to finding 29. *See* Tex. R. Civ. P. 47.1; *In re Sigmar*, 270 S.W.3d at 300. However, we observe that the record also supports finding 24—a finding that Chen does not challenge in this issue—in which the trial court found that Chen had violated the temporary orders. The uncontroverted evidence showed that Chen failed to established K.R.H.C.'s primary residence in Travis or contiguous counties by August 22, 2010, in violation of the trial court's temporary orders. In addition, both Hernandez and Smith testified that Chen did not always abide by the trial court's orders. Thus, there was credible evidence that Chen has a history of violating court orders, an additional risk factor under subsection (a). *See* Tex. Fam. Code Ann. § 153.502(a)(6) (trial court shall consider evidence that parent has history of violating court orders).

31. The credible evidence presented at trial showed that Chia-Yeng [sic] "Persephone" Chen lacks strong ties to the United States.

32. Chia-Yeng [sic] "Persephone" Chen's immediate family lives in Taiwan.

33. Chia-Yeng [sic] "Persephone" Chen testified that she is on a temporary visa to the United States and that her employer in Plano, Texas, was willing to sponsor her in her attempt to obtain a permanent work visa; however, if Chia-Yeng [sic] "Persephone" Chen relocated back to Travis County, Texas, to be closer to [K.R.H.C.], there was no guarantee that any new employer would continue to sponsor her.

34. Chia-Yeng [sic] "Persephone" Chen does not own a home in the United States.

35. The credible evidence presented at trial, and supplemented by the parties, showed that there exists a risk of international abduction as set out in Texas Family Code Section 153.502(a)(1), (b)( 1) and (b)(2).

*See* Tex. Fam. Code Ann. § 153.502(b)(1), (2). The evidence relating to these findings showed that, although Chen has three aunts who reside in the U.S. and has made friends who reside in Texas, Chen's parents and only sibling live in Taiwan and she had not intended to stay in the U.S. until she became pregnant. Although Chen testified that she now intends to stay in the U.S. so that her child could have a relationship with his father, Smith testified that what Chen had told her did not always "come to fruition," that in her observation Chen had not always complied with the agreements of the parties and the trial court's orders, and that she believed the risk that Chen would return to Taiwan should not be disregarded. The evidence also showed that Chen had been in the U.S. more than two years, was currently in the U.S. under an H-1B visa that can be extended up to six years, had worked with three employer sponsors, and had yet to obtain a green card. Viewed in the light most

26

favorable to the trial court's final order, this evidence constitutes credible evidence of the trial court's findings under subsection (b). *See id.*; *In re Sigmar*, 270 S.W.3d at 301.

Because the trial court found credible evidence of a risk of international abduction under subsection (a), it could also consider evidence relevant to the factors listed in subsection (c). *See* Tex. Fam. Code Ann. § 153.502(c)(1)–(4). The trial court's only finding under subsection (c) is contained in finding 30, in which the trial court found that Taiwan is a country that is not a signatory to or compliant with the Hague Convention on the Civil Aspects of International Child Abduction. *See id.* § 153.503(c)(4)(H). Chen contends that there is no evidence on this issue in the record for this Court to consider. However, this finding is a matter of legislative fact of which the trial court took judicial notice. *See In re Sigmar*, 270 S.W.3d at 301–02; *In re Graves*, 217 S.W.3d 744, 750 (Tex. App.—Waco 2007, orig. proceeding) ("Legislative facts . . . are not normally the objects of evidentiary proof. As to them, judicial notice instead of record evidence is the rule rather than the exception, and indisputability is not required to justify judicial notice.") (quoting 1 Steve Goode et al, *Texas Practice Series: Guide to the Texas Rules of Evidence* § 201.2 (3d ed. 2002)). "Evidence regarding the legal practices and procedures of a foreign country are legislative facts" subject to judicial notice. *In re Sigmar*, 270 S.W.3d at 302 (citing *Rodriquez v. State*, 90 S.W.3d 340, 360 (Tex. App.—El Paso 2001, pet. ref'd)). In addition, although the rules of evidence provide a method for parties to request that a court take judicial notice of laws of a foreign country, *see* Tex. R. Evid 203, "facts regarding another country's compliance with the Hague Convention on the Civil Aspects of International Child Abduction . . . are legislative facts about which a trial or appellate court may take judicial notice without prompting by the parties." *In re*

*Sigmar*, 270 S.W.3d at 302; *see also Dutton v. Dutton*, 18 S.W.3d 849, 856 (Tex. App.—Eastland 2000, pet. denied) ("This court may take judicial notice, even if no one requested the trial court to do so and even if the trial court did not announce that it would do so."); *Trujillo v. State*, 809 S.W.2d 593, 595–96 (Tex. App.—San Antonio 1991, no. pet.) (trial court or appellate court could take judicial notice that school was accredited by state).

The record reflects that the trial court took judicial notice of the guidelines for obtaining passports for minors in the U.S. and Taiwan at the request of the parties and reviewed exhibits and government websites concerning passport procedures and the "Hague Convention issues with regard to countries who are not signatories to the Hague convention and the passport restrictions." The trial court stated that before ruling it needed to review the information more thoroughly to ensure a complete understanding of the passport requirements and "to make sure that [it had] all of the information necessary for the Court to make its ruling." The website for the U.S. Department of State provides a helpful resource concerning international travel and practices and procedures relevant to international abduction. It states that Taiwan is not a party to the Hague Convention on the Civil Aspects of International Child Abduction and that there are no treaties in force between the U.S. and Taiwan.[14] Viewing the record and judicially-noticed information in the light most favorable to the trial court's order, we conclude that there was credible evidence to support the finding under subsection (c) that Taiwan is not a signatory to the Hague Convention on

---

[14] *See* U.S. Department of State, http://travel.state.gov/abduction/country/country_527.html (last visited July 30, 2012); *see also id.*, http://adoption.state.gov/hague_convention/countries.php (last visited July 30, 2012) (list of countries that are parties to Hague Convention does not include Taiwan).

28

the Civil Aspects of International Child Abduction.  Accordingly, we further conclude that credible evidence supports the trial court's finding of a potential risk of international abduction.  *See In re Sigmar*, 270 S.W.3d at 304; *Boyo*, 196 S.W.3d at 424; *Karenev*, 2008 Tex. App. LEXIS 2087, at *9–10.

In its order, the trial court ordered several abduction prevention measures authorized under section 153.503:  that Chen and any person acting on her behalf are prohibited from removing K.R.H.C. from Texas or the U.S., *see* Tex. Fam. Code Ann. § 153.503(4)(A); that Chen shall surrender any passport issued in the name of K.R.H.C. and is prohibited from applying for a passport or visa on his behalf, *see id.* § 153.503(4)(B), (C); that Chen shall provide to the appropriate authorities a properly authenticated copy of the order and her agreement to it and provide to the trial court proof of receipt by the authorities, *see id.* § 153.503(5)(A)(i), (ii) & (B); and that the appropriate law enforcement agencies are authorized to take measures to prevent Chen from abducting K.R.H.C., *see id.* § 153.503(7).  The order further included provisions stating that the trial court had jurisdiction over the case and the parties, the U.S. is the habitual residence of K.R.H.C., and Chen's violation of the international abduction order may subject her to civil or criminal penalties.  *See id.* § 153.503(8)(A)–(C).

Chen challenges the following conclusions of law related to the abduction prevention measures:

7.  Based upon the testimony presented at trial, the best interest of the child and the relevant factors set forth in the Texas Family Code, relief stated in Texas Family Code Sections 153.503(4)(A), (4)(C), (5)(A), (5)(B), (7), (8)(A), (8)(B) and (8)(C) should be granted.

29

8.  Based upon the testimony presented at trial, the best interest of the child and the relevant factors set forth in the Texas Family Code, Marc Hernandez should have the exclusive right to obtain and maintain the passport for the Child.

As we have discussed, there was credible evidence to support the trial court's findings under section 153.502. In addition, the guardian ad litem expressed concerns regarding the potential for international abduction by Chen and requested the trial court to implement abduction prevention measures. We therefore conclude that the trial court had sufficient evidence on which to exercise its discretion and did so appropriately in ordering the abduction prevention measures. *See Zeifman*, 212 S.W.3d at 588; *Echols*, 85 S.W.3d at 478. We overrule issue three.

### Lack of Cooperation

In her fourth issue, Chen argues that the trial court abused its discretion in awarding Hernandez the exclusive right to designate K.R.H.C.'s primary residence based on Chen's lack of cooperation with Hernandez. She challenges the following findings of fact:

11. There were frequent problems regarding communication, visits and possession schedules and the parties consistently had difficulties being able to agree on what was in the child's best interest.

12. Chia-Ying "Persephone" Chen had a particularly difficult time abiding by the terms of their agreements, showing flexibility in co-parenting, communicating and fostering a relationship between the child and his father.

30

Chen contends that there was "insufficient evidence to support this as a basis for altering custody."[15] We construe this issue as a challenge to the factual sufficiency of the evidence to support findings 11 and 12 and conclude that parental cooperation can be considered in decisions regarding the right to designate primary residence and the record as a whole supports findings 11 and 12.

There was conflicting evidence related to cooperation between the parties, including the testimony of, and email exchanges between, Chen, Hernandez, and Smith, as well as Smith's report. Chen testified generally that she always tried her best to accommodate Hernandez's visitation requests and described instances in which she had changed plans to do so. However, Hernandez testified about a number of times that Chen had refused his requests, and his testimony was generally supported by emails and the testimony and report of Smith, who characterized the case as one of "high conflict" and expressed concern that Chen consistently declined to participate in transportation for visitation and attempted to limit Hernandez's time with K.R.H.C. Both Hernandez and Smith also observed that Chen had not always complied with the parties' agreements and the court's orders.

We must defer to the trial court's assessments of demeanor and credibility. *See City of Keller*, 168 S.W.3d at 819; *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120 (Tex. 2000). "The trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record," and a trial court does not abuse its discretion as long as there is some substantive, probative evidence to support its decision. *Echols*, 85 S.W.3d at 477) (citing *Jeffers*, 615 S.W.2d at 253) (quoting

---

[15] Again, we observe that this case involves an original determination of conservatorship, not a modification.

31

quoting *Thompson*, 191 S.W.2d at 493). On this record, we conclude that the trial court could have reasonably credited Hernandez's and Smith's testimony, that findings 11 and 12 are not so against the great weight of the evidence as to be clearly wrong and manifestly unjust, and that there was factually sufficient evidence to support the findings. *See Cain*, 709 S.W.2d at 176. Accordingly, we conclude that the trial court had sufficient information on which to exercise its discretion and did so appropriately. *See Zeifman*, 212 S.W.3d at 588; *Echols*, 85 S.W.3d at 478. We overrule issue four.

**Best Interest of the Child**

In her fifth issue, Chen contends that it was not in the best interest of K.R.H.C. for Hernandez to be named conservator with the exclusive right to designate his primary residence. The trial court is given wide latitude in determining the best interest of a minor child. *Gillespie*, 644 S.W.2d at 451. The supreme court set out a number of factors for a trial court to consider in determining a child's best interest in *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976). Those factors include the desires of the child, the emotional and physical needs of and danger to the child now and in the future, the parental abilities of the individuals seeking custody, the plans for the child by the individual seeking custody, the programs available to assist these individuals to promote the best interest of the child, the stability of the home, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Id.* at 371–72. This list of factors is not exhaustive, not all of them are present in every case, and not all of them need to be proven to determine a child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *Holley*, 544 S.W.2d at 372.

32

Several of the *Holley* factors are implicated in this case. Although K.R.H.C. is very young, there was some evidence of his desires. Smith testified that he was very bonded to both parents. However, Hernandez's wife testified that K.R.H.C. typically does not want to leave their home at the end of visitation, and Smith testified that she witnessed one such instance in which K.R.H.C. stated that he did not want to go when it was time to return to Chen. Regarding parenting abilities, Smith testified that Chen and Hernandez were equally qualified to care and provide for K.R.H.C. Chen testified about her plan for K.R.H.C. if she were granted the right to designate his primary residence. She stated that she had selected a daycare facility for K.R.H.C. to attend, K.R.H.C. is learning Spanish, and she has plans for him to learn French. She also stated that she would do her best to involve Hernandez by allowing phone and video conference access, helping with transportation, and allowing K.R.H.C. to spend the night in an area hotel with Hernandez.

Concerning his plans for the child, Hernandez testified that his flexible work schedule and his wife's status as a stay-at-home mother would enable them both to care for K.R.H.C. during the day. He also stated that he would enroll K.R.H.C. in daycare or other programs for socialization and continue K.R.H.C.'s Chinese education by using flash cards and learning Chinese himself. In addition, Hernandez testified that K.R.H.C. would often be around Hernandez's step-children, with whom he is very bonded, as well as K.R.H.C.'s half-sister, who was born in December 2010. Finally, there was evidence regarding the stability of the home that each parent would provide. The evidence showed that Chen had lived in a number of different places in the last two years, two of which were temporary places with different families and different daycare hours. Smith testified that she was concerned that K.R.H.C. had been "bounced around quite a bit." In contrast, the evidence

33

showed that Hernandez had moved once during the same time period, and Smith testified that "the only stability [K.R.H.C.] has continued to have is at Mr. Hernandez's house because it is the same house and it's the same place and it's the same people."

When a trial court designates parents as joint managing conservators, it must award one of them the exclusive right to designate the child's primary residence. Tex. Fam. Code Ann. § 153.134(b)(1) (West 2008). In making this determination, the trial court is vested with broad discretion. *In re K.L.W.*, 301 S.W.3d at 428. We will not disturb the trial court's order unless the record as a whole shows that the trial court abused its discretion. *Id.* at 424. Here, the trial court was faced with a difficult choice between two fit parents who both love and are capable of caring for their child. Its extensive findings of fact affirmatively indicate that it considered the relevant factors under family code section 153.001(a) and applicable factors discussed in *Holley*. *See id.* § 153.001(a) (West 2008); *Holley*, 544 S.W.2d at 371–72. Those findings are supported by the record, including the testimony of the guardian ad litem. Additionally, the findings support the trial court's conclusions of law that it was in the best interest of K.R.H.C. for Hernandez to have the right to designate K.R.H.C.'s residence. Therefore, on this record, we conclude that the trial court had sufficient evidence upon which to exercise its discretion and did not abuse that discretion in designating Hernandez as the conservator with the exclusive right to determine K.R.H.C.'s primary residence. *See Zeifman*, 212 S.W.3d at 588; *Echols*, 85 S.W.3d at 478. We overrule issue five.

## CONCLUSION

Having overruled Chen's five issues, we affirm the trial court's order.

_____

Melissa Goodwin, Justice

Before Justices Puryear, Rose and Goodwin

Affirmed

Filed:   August 28, 2012